UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:20-CV-00154-TBR

UNITED STATES OF AMERICA                                           PLAINTIFF

v.

GOODRICH CORPORATION (f.k.a.                                       DEFENDANTS
B.F. Goodrich Corporation);
WESTLAKE VINYLS, INC.; and
POLYONE CORPORATION

MEMORANDUM OPINION

Before the Court is the Unopposed Motion to Approve Consent Judgment, DN 4. For the

reasons stated below, the motion is GRANTED. The Court will enter a separate Order and

Judgment contemporaneous to this Memorandum Opinion.

I.    Background

The United States instituted this action alleging that defendants Goodrich Corporation,

Westlake Vinyls Incorporated, and PolyOne Corporation are liable under the Comprehensive

Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 94 Stat. 2767, as

amended, 42 U.S.C. § 9601 *et seq*., for costs incurred and to be incurred related to the releases and

threatened releases of hazardous substances at the B.F. Goodrich Superfund Site in Calvert City,

Marshall County, Kentucky.[1] [DN 1, Complaint]. Thereafter, the United States filed a Notice of

Lodging Proposed Consent Decree, which explained, "[t]he Consent Decree resolves the United

States' claims against the Settling Defendants in the above-captioned action." [DN 3 at 1-2]. The

United States informed the Court that it would publish a notice in the Federal Register to alert the

---

[1] Superfund Site: B.F. Goodrich, Calvert City, KY, United States Environmental Protection Agency,
https://cumulis.epa.gov/supercpad/cursites/csitinfo.cfm?id=0401930 (last visited January 27, 2021).

public that a proposed settlement had been filed and to provide an opportunity for public comment

as required by statute. *Id*. The United States then filed an Unopposed Motion to Approve Consent

Judgment, stating that the proposed Consent Decree was published in the Federal Register on

September 24, 2020, and during the subsequent 30-day period for public comment, no comments

were received. [DN 4 at 3]. In the motion, the United States describes the substance of the Consent

Decree as follows:

> Under the proposed Consent Decree, the Defendants will implement the Remedial
> Action for the Site selected in EPA's Record of Decision, issued in September of
> 2018. Key elements of the remedy include the installation of a three-mile long sub-
> surface barrier wall around the perimeter of the onshore contamination; collection
> and treatment of groundwater within the containment area; recovery of non-
> aqueous phase liquid ("NAPL") from accessible onshore areas; dredging of
> contaminated sediments from the barge slip; closure of two ponds; recovery of
> NAPL from beneath the Tennessee River; and treatment of the groundwater plume
> beneath the river. The estimated cost of the cleanup work to be performed by the
> Defendants pursuant to the Consent Decree is $97,000,000. Under the Consent
> Decree, the Defendants have agreed to pay all of EPA's costs incurred in overseeing
> the construction of the Remedial Action. In return, the United States is providing
> certain covenants not to sue under Sections 106 and 107 of CERCLA, 42 U.S.C.
> §§ 9606 or 9607, and Section 7003 of RCRA, 42 U.S.C. § 6973, with respect to the
> Site. In addition, the Consent Decree provides protection from contribution claims
> pursuant to Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2).

*Id*. at 2-3.[2]

## II.    Legal Standards

Before approving the proposed consent decree, the Court must assess whether the decree

is fair, adequate, and reasonable. *United States v. Akzo Coatings of America, Inc.*, 949 F.2d 1409,

1435 (6th Cir. 1991). A consent decree's consistency with CERCLA and its protection of the

---

[2] Two days after filing the Unopposed Motion to Approve Consent Judgment, DN 4, the United States filed a Notice of Errata, DN 5, notifying the Court that the cost of cleanup work cited in the motion was incorrect. [DN 5 at 1]. Though the Unopposed Motion to Approve Consent Judgment states that the estimated cost of cleanup work to be performed by the Defendants pursuant to the Consent Decree is $97,000,000, the Notice of Errata clarifies that the cost of the cleanup in the Consent Decree is $89,000,000. [DN 4 at 2; DN 5 at 1]. The Consent Decree, DN 4-1, attached to the Unopposed Motion to Approve Consent Judgment, DN 4, accurately states that the estimated cost of the remedial work to be performed is $89,000,000. [DN 4-1 at 15]. The Court held a telephonic conference with the parties on this issue to ensure that the error in the motion was merely typographical. [*See* DN 10].

public interest bear on a court's assessment of fairness, adequacy, and reasonableness. *Id*. (citing *Acushnet River & New Bedford Harbor Procs. re Alleged PCB Pollution*, 712 F. Supp. 1019, 1028 (D. Mass. 1989); *United States v. Ketchikan Pulp Co*., 430 F. Supp. 83, 86 (D. Ala. 1977)) ("Protection of the public interest is the key consideration in assessing whether a decree is fair, reasonable and adequate."); *Ford Motor Co. v. Mich. Consol. Gas. Co.*, No. 08–CV–13503–DT, 2012 WL 4498112, at *4 (E.D. Mich., Sep. 28, 2012) (citing *United States v. County of Muskegon*, 298 F.3d 569, 580–81 (6th Cir. 2002); *United States v. Lexington-Fayette Urb. Cty. Gov't*, 591 F.3d 484, 489 (6th Cir. 2010)). As the Supreme Court recently described in *Atlantic Richfield Co. v. Christian*, 140 S.Ct. 1335, 1345 (2020), CERCLA was enacted "to address 'the serious environmental and health risks posed by industrial pollution,'" and "to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts [are] borne by those responsible for the contamination." *Id*. (quoting *Burlington N. & S. F. R. Co. v. United States*, 556 U.S. 599, 602, (2009); *CTS Corp. v. Waldburger*, 573 U.S. 1, 4, (2014)).

## III.    Discussion

The first factor the Court must examine is fairness. In evaluating a consent decree's fairness, the Sixth Circuit has considered "the strength of plaintiff's case, the good faith efforts of the negotiators, the opinions of counsel, and the possible risks involved in the litigation if the settlement is not approved." *Akzo*, 949 F.2d at 1435 (citations omitted). It is notable that the Kentucky Department of Environmental Protection (KDEP) and the Environmental Protection Agency (EPA) have been working with numerous involved parties to clean up and to evaluate the further work needed at the B.F. Goodrich Site since the 1980s.[3] It is clear to the Court that

---

[3] Superfund Site: B.F. Goodrich, Calvert City, KY, Cleanup Activities, United States Environmental Protection Agency, https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.Cleanup&id=0401930#Done (last visited January 27, 2021) ("In the late 1980s, KDEP required Goodrich to pump and treat contaminated groundwater to prevent its discharge to the river.").

much time has been dedicated to studying the issues at the B.F. Goodrich Site and developing a cleanup plan. Additionally, it appears that Goodrich Corporation, PolyOne Corporation, and Westlake Vinyls have been aware of their potential liability for more than a decade.[4] Thus, it is apparent that the plaintiff's case is strong and the defendants have had ample time to assess their exposure and negotiate their liability. The Court also takes note that in the Complaint, the United States cited the estimated value of the cleanup work under the EPA Administrator's Record of Decision as $108 million. [DN 1 at 6]. However, the parties agreed to financial assurance of $89 million in the consent decree. [DN 4-1 at 15]. This suggests to the Court that the consent decree was reached as a result of arm's length negotiations by good faith negotiators. Given these considerations, the Court finds that consent decree is fair.

The Court next considers the adequacy and reasonableness of the consent decree. As the Sixth Circuit outlined in *Akzo*, the reasonableness of a consent decree may be measured by "the nature/extent of hazards; the degree to which the remedy will adequately address the hazards; possible alternatives for remedying hazards; and the extent to which the decree furthers the goals of the statute." 949 F.2d at 1436 (citations omitted). Moreover, "[o]ne of the most important considerations when evaluating whether a proposed consent decree is reasonable is 'the decree's likely effectiveness as a vehicle for cleansing' the environment." *Ford Motor Co.*, 2012 WL 4498112, at *6 (quoting *Lexington-Fayette Urb. Cty. Gov't*, 591 F.3d at 489). The time the parties have dedicated to studying the issues, developing a remedial plan, and negotiating the consent decree is, on its own, a significant indication that the cleanup measures required by the decree will be effective. Moreover, this Court must give considerable deference to the EPA in its evaluation of the issues and the planned response. *Akzo*, 949 F.2d at 1426 (citations omitted)

---

[4] U.S. Environmental Protection Agency, *Superfund Program Proposed Plan: BF Goodrich Superfund Site* 2 (2017), https://semspub.epa.gov/src/document/04/11095220.

("[I]n evaluating the efforts of an agency charged with making technical judgments and weighing complex data, we must give a proper degree of deference to the agency's expertise."). After reviewing the record documents and considering CERCLA's goals, in addition to the considerations above, the Court finds that the consent decree is adequate and reasonable.

Because the Court finds that the consent decree is fair, adequate, and reasonable, and that it complies with CERCLA and protects the public interest, the Court will grant the motion to approve the consent decree.

## IV.   Conclusion

For the reasons stated herein, **IT IS HEREBY ORDERED**:

1.   The Unopposed Motion to Approve Consent Judgment, DN 4, is **GRANTED**.

2.   The Court will file along with this Memorandum Opinion a signed copy of the final consent decree.

3.   The Court will enter a separate Order and Judgment contemporaneous to this Memorandum Opinion.

4.   The Clerk is directed to close the case.

**Thomas B. Russell, Senior Judge**
**United States District Court**

January 27, 2021

cc: counsel

5

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**CIVIL DIVISION**

UNITED STATES OF AMERICA

                         Plaintiff,

            v.

Goodrich Corporation,
PolyOne Corporation,
Westlake Vinyls, Inc.

                  Defendants.

Civil Action No. 5:20-cv-00154 - TBR

**REMEDIAL ACTION**

**CONSENT DECREE**

# TABLE OF CONTENTS

I.      BACKGROUND ...................................................................................................1
II.     JURISDICTION .................................................................................................2
III.    PARTIES BOUND .............................................................................................2
IV.     DEFINITIONS.....................................................................................................3
V.      GENERAL PROVISIONS .................................................................................6
VI.     PERFORMANCE OF THE WORK ...................................................................7
VII.    REMEDY REVIEW ..........................................................................................10
VIII.   PROPERTY REQUIREMENTS .......................................................................10
IX.     FINANCIAL ASSURANCE .............................................................................15
X.      PAYMENTS FOR RESPONSE COSTS...........................................................17
XI.     INDEMNIFICATION AND INSURANCE .......................................................20
XII.    FORCE MAJEURE ...........................................................................................21
XIII.   DISPUTE RESOLUTION ..................................................................................22
XIV.    STIPULATED PENALTIES .............................................................................24
XV.     COVENANTS BY PLAINTIFF.........................................................................27
XVI.    COVENANTS BY SDs ......................................................................................29
XVII.   EFFECT OF SETTLEMENT; CONTRIBUTION ............................................31
XVIII.  ACCESS TO INFORMATION .........................................................................32
XIX.    RETENTION OF RECORDS ...........................................................................33
XX.     NOTICES AND SUBMISSIONS .....................................................................34
XXI.    RETENTION OF JURISDICTION ...................................................................36
XXII.   APPENDICES ...................................................................................................36
XXIII.  MODIFICATION ..............................................................................................36
XXIV.   LODGING AND OPPORTUNITY FOR PUBLIC COMMENT ...........................36
XXV.    SIGNATORIES/SERVICE................................................................................37
XXVI.   FINAL JUDGMENT .........................................................................................37

# I.    BACKGROUND

A.      The United States of America ("United States"), on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), filed a complaint in this matter pursuant to Sections 106 and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9606 and 9607.

B.      The United States in its complaint seeks, *inter alia:* (1) reimbursement of costs incurred by the EPA and the Department of Justice (DOJ) for response actions at the B.F. Goodrich Superfund Site in Calvert City, Marshall County, Kentucky ("Site"), together with accrued interest; and (2) performance of response actions by the defendants at the Site consistent with the National Contingency Plan, 40 C.F.R. Part 300 ("NCP").

C.      In accordance with the NCP and Section 121(f)(1)(F) of CERCLA, 42 U.S.C. § 9621(f)(1)(F), the EPA notified the Commonwealth of Kentucky (the "State") on August 27, 2019, of negotiations with potentially responsible parties ("PRPs") regarding the implementation of the remedial action ("RA") for the Site, and the EPA has provided the State with an opportunity to participate in such negotiations and be a party to this Consent Decree ("CD").

D.      In accordance with Section 122(j)(1) of CERCLA, 42 U.S.C. § 9622(j)(1), the EPA notified the United States Fish and Wildlife Service on August 27, 2019, of negotiations with PRPs regarding the release of hazardous substances that may have resulted in injury to the natural resources under federal trusteeship and encouraged the trustee(s) to participate in the negotiation of this CD.

E.      The defendants that have entered into this CD ("Settling Defendants" or "SDs") do not admit any liability to Plaintiffs arising out of the transactions or occurrences alleged in the complaints, nor do they acknowledge that the release or threatened release of hazardous substance(s) at or from the Site constitutes an imminent and substantial endangerment to the public health or welfare or the environment.

F.      Pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, the EPA placed the Site on the National Priorities List (NPL) on September 8, 1983.

G.      In response to a release or a substantial threat of a release of a hazardous substance(s) at or from the Site, the EPA and SDs, commenced on December 2009, a Remedial Investigation and Feasibility Study ("RI/FS") for the Site pursuant to 40 C.F.R. § 300.430.

H.      The EPA and SDs completed a Remedial Investigation ("RI") Report and a Feasibility Study ("FS") Report on September 5, 2018.

I.      Pursuant to Section 117 of CERCLA, 42 U.S.C. § 9617, the EPA published notice of the completion of the FS and of the proposed plan for remedial action on November 2017, followed by notice of a proposed plan amendment in June 2018, in a major local newspaper of general circulation. The EPA provided an opportunity for written and oral comments from the public on the proposed plan and proposed plan amendment for remedial action. A copy of the transcript of the public meeting is available to the public as part of the administrative record

1

upon which the Regional Administrator, EPA Region 4, based the selection of the response action.

 J. The decision by the EPA on the remedial action to be implemented at the Site is embodied in a final Record of Decision ("ROD"), executed on September 5, 2018, on which the State had a reasonable opportunity to review and comment/on which the State has given its concurrence. The ROD includes the EPA's explanation for any significant differences between the final plan and the proposed plan as well as a responsiveness summary to the public comments. Notice of the final plan was published in accordance with Section 117(b) of CERCLA, 42 U.S.C. § 9617(b).

 K. Based on the information presently available to the EPA, EPA believes that the Work will be properly and promptly conducted by SDs if conducted in accordance with this CD and its appendices.

 L. Solely for the purposes of Section 113(j) of CERCLA, 42 U.S.C. § 9613(j), the remedy set forth in the ROD and the Work to be performed by SDs shall constitute a response action taken or ordered by the President for which judicial review shall be limited to the administrative record.

 M. The Parties recognize, and the Court by entering this CD finds, that this CD has been negotiated by the Parties in good faith and implementation of this CD will expedite the cleanup of the Site and will avoid prolonged and complicated litigation between the Parties, and that this CD is fair, reasonable, and in the public interest.

 NOW, THEREFORE, it is hereby Ordered, Adjudged, and Decreed:

## II. JURISDICTION

 1. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345, and 42 U.S.C. §§ 9606, 9607, and 9613(b). This Court also has personal jurisdiction over SDs for purposes of this action. Solely for the purposes of this CD and the underlying complaints, SDs waive all objections and defenses that they may have to jurisdiction of the Court or to venue in this District. SDs shall not challenge the terms of this CD or this Court's jurisdiction to enter and enforce this CD.

## III. PARTIES BOUND

 2. This CD is binding upon the United States and upon SDs and their heirs, successors, and assigns. Any change in ownership or corporate or other legal status of a SD including, but not limited to, any transfer of assets or real or personal property, shall in no way alter such SD's responsibilities under this CD.

 3. SDs shall provide a copy of this CD to each contractor hired to perform the Work and to each person representing any SD with respect to the Site or the Work and shall condition all contracts entered into hereunder upon performance of the Work in conformity with the terms of this CD. SDs or their contractors shall provide written notice of the CD to all subcontractors hired to perform any portion of the Work. SDs shall nonetheless be responsible for ensuring that

their contractors and subcontractors perform the Work in accordance with the terms of this CD. With regard to the activities undertaken pursuant to this CD, each contractor and subcontractor shall be deemed to be in a contractual relationship with SDs within the meaning of Section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3).

## IV.  DEFINITIONS

4.      Unless otherwise expressly provided in this CD, terms used in this CD that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this CD or its appendices, the following definitions shall apply solely for purposes of this CD:

"Affected Property" shall mean all real property at the Site and any other real property where the EPA determines, at any time, that access, land, water, or other resource use restrictions, and/or Institutional Controls are needed to implement the Remedial Action, including, but not limited to, the following properties located on the southern side of the Tennessee River approximately 4 miles downstream from the Kentucky Dam, bordered on the north by the Tennessee River, on the south by Kentucky Highway 1523, in the west by areas owned by Air Products and Chemicals, Inc., and Carbide Industries LLC, and on the east by areas owned by PolyOne Corporation ("PolyOne'), Messer LLC ("Messer"), Westlake Vinyls, Inc. ("Westlake") and Airco Superfund Site owned by Messer.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675.

"Consent Decree" or "CD" shall mean this consent decree and all appendices attached hereto (listed in Section XXII). In the event of conflict between this CD and any appendix, this CD shall control.

"Day" or "day" shall mean a calendar day. In computing any period under this CD, where the last day would fall on a Saturday, Sunday, or federal or State holiday, the period shall run until the close of business of the next working day.

"DOJ" shall mean the United States Department of Justice and its successor departments, agencies, or instrumentalities.

"Effective Date" shall mean the date upon which the approval of this CD is recorded on the Court's docket.

"EPA" shall mean the United States Environmental Protection Agency and its successor departments, agencies, or instrumentalities.

"EPA Hazardous Substance Superfund" shall mean the Hazardous Substance Superfund established by the Internal Revenue Code, 26 U.S.C. § 9507.

"KDEP" shall mean the Kentucky Department for Environmental Protection and any successor departments or agencies of the State.

3

"Future Oversight Costs" shall mean that portion of Future Response Costs that the EPA incurs in monitoring and supervising SDs' performance of the Work to determine whether such performance is consistent with the requirements of this CD, including costs incurred in reviewing deliverables submitted pursuant to this CD, as well as costs incurred in overseeing implementation of the Work; however, Future Oversight Costs do not include, *inter alia:* the costs incurred by the United States pursuant to ¶ 11 (Emergencies and Releases), Section VII (Remedy Review), Section VIII (Property Requirements), and ¶ 29 (Access to Financial Assurance), or the costs incurred by the United States in enforcing this CD, including all costs incurred pursuant to Section XIII (Dispute Resolution), and all litigation costs.

"Future Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States incurs in reviewing or developing deliverables submitted pursuant to this CD, in overseeing implementation of the Work, or otherwise implementing, overseeing, or enforcing this CD, including, but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, the costs incurred pursuant to ¶ 11 (Emergencies and Releases), ¶ 12 (Community Involvement) (including the costs of any technical assistance grant under Section 117(e) of CERCLA, 42 U.S.C. § 9617(e)), ¶ 29 (Access to Financial Assurance), Section VII (Remedy Review), Section VIII (Property Requirements) (including the cost of attorney time and any monies paid to secure or enforce access or land, water, or other resource use restrictions and/or to secure, implement, monitor, maintain, or enforce Institutional Controls including the amount of just compensation), and Section XIII (Dispute Resolution), and all litigation costs. Future Response Costs shall also include all Interim Response Costs.

"Institutional Controls" or "ICs" shall mean Proprietary Controls and state or local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices that: (a) limit land, water, or other resource use to minimize the potential for human exposure to Waste Material at or in connection with the Site; (b) limit land, water, or other resource use to implement, ensure non-interference with, or ensure the protectiveness of the RA; and/or (c) provide information intended to modify or guide human behavior at or in connection with the Site.

"Interim Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, (a) paid by the United States in connection with the Site between April 12, 2019 and the Effective Date, or (b) incurred prior to the Effective Date but paid after that date.

"Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year. Rates are available online at https://www.epa.gov/superfund/superfund-interest-rates.

"B.F. Goodrich Superfund Site Special Account" shall mean the special account, within the EPA Hazardous Substance Superfund, established for the Site by the EPA pursuant to Section 122(b)(3) of CERCLA, 42 U.S.C. § 9622(b)(3), and Administrative Settlement Agreement and Order on Consent ("AOC") for Remedial Design signed on April 11, 2019 (CERCLA Docket No. 04-2019-3765).

4

"National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

"Non-Settling Owner" shall mean any person, other than a SD, that owns or controls any Affected Property, including Carbide Industries LLC, Air Products and Chemicals, Inc., Lubrizol Advanced Materials, Cymetech Corporation, and Messer. The clause "Non-Settling Owner's Affected Property" means Affected Property owned or controlled by Non-Settling Owner.

"Operation and Maintenance" or "O&M" shall mean all activities required to operate, maintain, and monitor the effectiveness of the RA as specified in the Work Plan or any EPA-approved O&M Plan.

"Owner SD" shall mean any SD that owns or controls any Affected Property, including PolyOne and Westlake. The clause "Owner SD's Affected Property" means Affected Property owned or controlled by Owner SD.

"Paragraph" or "¶" shall mean a portion of this CD identified by an Arabic numeral or an upper or lower case letter.

"Parties" shall mean the United States and SDs.

"Performance Standards" or "PS" shall mean the cleanup levels and other measures of achievement of the remedial action objectives, as set forth in the ROD.

"Plaintiff" shall mean the United States.

"Proprietary Controls" shall mean easements or covenants running with the land that (a) limit land, water, or other resource use and/or provide access rights and (b) are created pursuant to common law or statutory law by an instrument that is recorded in the appropriate land records office.

"RCRA" shall mean the Solid Waste Disposal Act, 42 U.S.C. §§ 6901-6992 (also known as the Resource Conservation and Recovery Act).

"Record of Decision" or "ROD" shall mean the EPA Record of Decision relating to the Site signed on September 5, 2018, by the Administrator, and all attachments thereto. The ROD is attached as Appendix A.

"Remedial Action" or "RA" shall mean the remedial action selected in the ROD.

"Remedial Action Work Plan" or "Work Plan" or "RAWP" shall mean the document describing the activities SDs must perform to implement the RA and O&M regarding the Site, which is attached as Appendix B.

"Remedial Design" or "RD" shall mean those activities to be undertaken by SDs to develop final plans and specifications for the RA pursuant to the AOC (CERCLA Docket No.

04-2019-3765) that was executed by the EPA and SDs to conduct the Remedial Design at the Site on April 11, 2019.

"Section" shall mean a portion of this CD identified by a Roman numeral.

"Settling Defendants" or "SDs" shall mean those Parties identified in Appendix D.

"Site" shall mean the B.F. Goodrich Superfund Site, 250 acres, located in, Calvert City, Marshall County, Kentucky, and depicted generally on the map attached as Appendix C.

"State" shall mean the State or Commonwealth of Kentucky.

"Supervising Contractor" shall mean the principal contractor retained by SDs to supervise and direct the implementation of the Work for a remedy component under this CD.

"Transfer" shall mean to sell, assign, convey, lease, mortgage, or grant a security interest in, or where used as a noun, a sale, assignment, conveyance, or other disposition of any interest by operation of law or otherwise.

"United States" shall mean the United States of America and each department, agency, and instrumentality of the United States, including EPA, and any federal natural resource trustee.

"Waste Material" shall mean (1) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); (3) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27).

"Work" shall mean all activities and obligations SDs are required to perform under this CD, except the activities required under Section XIX (Retention of Records).

## V.   GENERAL PROVISIONS

5.      **Objectives of the Parties.** The objectives of the Parties in entering into this CD are to protect public health or welfare or the environment by the implementation of response actions at the Site by SDs, to pay response costs of Plaintiff, and to resolve the claims of Plaintiff against SDs as provided in this CD.

6.      **Commitments by SDs**

        a.      SDs shall finance and perform the Work in accordance with this CD and all deliverables developed by SDs and approved or modified by EPA pursuant to this CD. SDs shall pay the United States for its response costs as provided in this CD.

        b.      SDs' obligations to finance and perform the Work, including obligations to pay amounts due under this CD, are joint and several; provided, however, that this CD shall not alter, modify, amend or supersede in any way the agreements between or among any of the SDs, or any arbitration awards or court judgments pertaining to any of the SDs in connection

6

with the Site;. In the event of the insolvency of any SD or the failure by any SD to implement any requirement of this CD, the remaining SDs shall complete all such requirements.

7.      **Compliance with Applicable Law.** Nothing in this CD limits SDs' obligations to comply with the requirements of all applicable federal and state laws and regulations. SDs must also comply with all applicable or relevant and appropriate requirements of all federal and state environmental laws as set forth in the ROD and the Work Plan. The activities conducted pursuant to this CD, if approved by the EPA, shall be deemed to be consistent with the NCP as provided in Section 300.700(c)(3)(ii) of the NCP.

8.      **Permits**

        a.      As provided in Section 121(e) of CERCLA, 42 U.S.C. § 9621(e), and Section 300.400(e) of the NCP, no permit shall be required for any portion of the Work conducted entirely on-site (i.e., within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work). Where any portion of the Work that is not on-site requires a federal or state permit or approval, SDs shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.

        b.      SDs may seek relief under the provisions of Section XII (Force Majeure) for any delay in the performance of the Work resulting from a failure to obtain, or a delay in obtaining, any permit or approval referenced in ¶ 8.a and required for the Work, provided that they have submitted timely and complete applications and taken all other actions necessary to obtain all such permits or approvals.

        c.      This CD is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

## VI.      PERFORMANCE OF THE WORK

9.      **Coordination and Supervision**

        a.      **Project Coordinators**

                (1)      SDs' Project Coordinators must have sufficient technical expertise to coordinate the Work. SDs' Project Coordinators may not be an attorney representing any SD in this matter and may not act as a Supervising Contractor. SDs' Project Coordinators may assign other representatives, including other contractors, to assist in coordinating the Work.

                (2)      EPA's project coordinator for the site will be Brad Jackson, Remedial Project Manager. EPA may designate other representatives, which may include its employees, contractors and/or consultants, to oversee the Work. EPA's Project Coordinator/Alternate Project Coordinator will have the same authority as a remedial project manager and/or an on-scene coordinator, as described in the NCP. This includes the authority to halt the Work and/or to conduct or direct any necessary response action when he or she determines that

7

conditions at the Site constitute an emergency or may present an immediate threat to public health or welfare or the environment due to a release or threatened release of Waste Material.

(3)     The State's Project Coordinator will be Sheri Uhlenbruch. The State may designate other representatives, including its employees, contractors and/or consultants to oversee the Work. For any meetings and inspections in which the EPA's Project Coordinator participates, the State's Project Coordinator also may participate. SDs shall notify the State reasonably in advance of any such meetings or inspections.

(4)     SDs' Project Coordinators shall meet and/or conduct telephone conferences with the EPA's and the State's Project Coordinator at least quarterly, or as otherwise agreed to by the parties.

b.     **Supervising Contractor.** SDs' proposed Supervising Contractor(s) must have sufficient technical expertise to supervise the Work and a quality assurance system that complies with ANSI/ASQC E4-2004, Quality Systems for Environmental Data and Technology Programs: Requirements with Guidance for Use (American National Standard).

c.     **Procedures for Disapproval/Notice to Proceed**

(1)     SDs shall designate, and notify the EPA, within [10] days after the Effective Date, of the name, title, contact information, and qualifications of the SDs' proposed Project Coordinators and Supervising Contractor(s), whose qualifications shall be subject to the EPA's review for verification based on objective assessment criteria (e.g., experience, capacity, technical expertise) and do not have a conflict of interest with respect to the project.

(2)     The EPA, after a reasonable opportunity for review and comment by the State, shall issue notices of disapproval and/or authorizations to proceed regarding the proposed Project Coordinator and Supervising Contractor(s), as applicable. If the EPA issues a notice of disapproval, SDs shall, within 30 days, submit to the EPA a list of supplemental proposed Project Coordinators and/or Supervising Contractor(s), as applicable, including a description of the qualifications of each. The EPA shall issue a notice of disapproval or authorization to proceed regarding each supplemental proposed coordinator and/or contractor. SDs may select any coordinator/contractor covered by an authorization to proceed and shall, within [21] days, notify the EPA of SDs' selection.

(3)     SDs may change their Project Coordinators and/or Supervising Contractor(s), as applicable, by following the procedures of ¶¶ 9.c(1) and 9.c(2).

10.     **Performance of Work in Accordance with Work Plan.** SDs shall (a) perform the RA; and (b) operate, maintain, and monitor the effectiveness of the RA; all in accordance with the Work Plan and all the EPA-approved, conditionally approved, or modified deliverables as required by the Work Plan. All deliverables required to be submitted for approval under the

8

CD or RAWP shall be subject to approval by the EPA in accordance with RAWP Section 7.8 (Approval of Deliverables).

11.     **Emergencies and Releases.** SDs shall comply with the emergency and release response and reporting requirements under RAWP Section 7.6.2 (Emergency Response and Reporting). Subject to Section XV (Covenants by Plaintiff), nothing in this CD, including RAWP Section 7.6.2, limits any authority of Plaintiff: (a) to take all appropriate action to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site, or (b) to direct or order such action, or seek an order from the Court, to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site. If, due to SDs' failure to take appropriate response action under RAWP Section 7.6.2, the EPA takes such action instead, SDs shall reimburse the EPA under Section X (Payments for Response Costs) for all costs of the response action.

12.     **Community Involvement.** If requested by the EPA, SDs shall conduct community involvement activities under the EPA's oversight as provided for in, and in accordance with, Section 5 (Community Involvement) of the RAWP. Such activities may include, but are not limited to, designation of a Community Involvement Coordinator and implementation of a technical assistance plan]. Costs incurred by the United States under this Section constitute Future Response Costs to be reimbursed under Section X (Payments for Response Costs).

13.     **Modification of Work Plan or Related Deliverables**

a.     If the EPA determines that it is necessary to modify the work specified in the Work Plan and/or in deliverables developed under the Work Plan in order to achieve and/or maintain the Performance Standards or to carry out and maintain the effectiveness of the RA, and such modification is consistent with the Scope of the Remedy set forth in Section 3.2 of the RAWP, then the EPA may notify SDs of such modification. If SDs object to the modification they may, within 30 days after the EPA's notification, seek dispute resolution under Section XIII.

b.     The Work Plan shall be modified: (1) in accordance with the modification issued by the EPA; or (2) if SDs invoke dispute resolution, in accordance with the final resolution of the dispute. The modification shall be incorporated into and enforceable under this CD, and SDs shall implement all work required by such modification. SDs shall incorporate the modification into the deliverable required under the Work Plan, as appropriate.

c.     Nothing in this Paragraph shall be construed to limit the EPA's authority to require performance of further response actions as otherwise provided in this CD.

14.     Nothing in this CD, the Work Plan, or any deliverable required under the Work Plan constitutes a warranty or representation of any kind by Plaintiffs that compliance with the work requirements set forth in the Work Plan or related deliverable will achieve the Performance Standards.

## VII.   REMEDY REVIEW

15.     **Periodic Review.** SDs shall conduct, in accordance with Section 7.5 (Periodic Review Support Plan) of the RAWP, studies and investigations to support the EPA's reviews under Section 121(c) of CERCLA, 42 U.S.C. § 9621(c), and applicable regulations, of whether the RA is protective of human health and the environment.

16.     **EPA Selection of Further Response Actions.** If the EPA determines, at any time, that the RA is not protective of human health and the environment, the EPA may select further response actions for the Site in accordance with the requirements of CERCLA and the NCP.

17.     **Opportunity to Comment.** SDs and, if required by Sections 113(k)(2) or 117 of CERCLA, 42 U.S.C. § 9613(k)(2) or 9617, the public, will be provided with an opportunity to comment on any further response actions proposed by the EPA as a result of the review conducted pursuant to Section 121(c) of CERCLA and to submit written comments for the record during the comment period.

18.     **SDs' Obligation to Perform Further Response Actions.** If the EPA selects further response actions relating to the Site, the EPA may require SDs to perform such further response actions, but only to the extent that the reopener conditions in ¶ 61 or 63 (United States' Pre- and Post-Certification Reservations) are satisfied. SDs may invoke the procedures set forth in Section XIII (Dispute Resolution) to dispute (a) the EPA's determination that the reopener conditions of ¶ 61 or 63 are satisfied, (b) the EPA's determination that the RA is not protective of human health and the environment, or (c) the EPA's selection of the further response actions. Disputes regarding the EPA's determination that the RA is not protective, or the EPA's selection of further response actions shall be resolved pursuant to ¶ 46 (Record Review).

19.     **Submission of Plans.** If SDs are required to perform further response actions pursuant to ¶ 18, they shall submit a plan for such response action to the EPA for approval in accordance with the procedures of Section VI (Performance of the Work by SDs). SDs shall implement the approved plan in accordance with this CD.

## VIII.   PROPERTY REQUIREMENTS

20.     **Agreements Regarding Access and Non-Interference.** SDs shall, with respect to any Non-Settling Owner's Affected Property, use best efforts to secure from such Non-Settling Owner an agreement, enforceable by SDs and by Plaintiff, providing that such Non-Settling Owner : (i) provide Plaintiff and the other SDs, and their representatives, contractors, and subcontractors with access at all reasonable times to such Affected Property to conduct any activity regarding the CD, including those listed in ¶ 20.a (Access Requirements); and (ii) refrain from using such Affected Property in any manner that the EPA determines will pose an unacceptable risk to human health or to the environment due to exposure to Waste Material, or interfere with or adversely affect the implementation, integrity, or protectiveness of the Remedial Action, including the restrictions listed in ¶ 20.b (Land, Water, or Other Resource Use Restrictions). Owner SDs shall, with respect to Owner SD's respective Affected Property, refrain from using such Affected Property in any manner that EPA determines will pose an unacceptable

10

risk to human health or to the environment due to exposure to Waste Material, or interfere with or adversely affect the implementation, integrity, or protectiveness of the Remedial Action, including the restrictions listed in ¶ 20.b (Land, Water, or Other Resource Use Restrictions). SDs shall provide a copy of such access and use restriction agreement(s) to the EPA and the State.

a.    **Access Requirements.** The following is a list of activities for which access is required regarding the Affected Property:

(1)    Monitoring the Work;

(2)    Verifying any data or information submitted to the United States or the State;

(3)    Conducting investigations regarding contamination at or near the Site;

(4)    Obtaining samples;

(5)    Assessing the need for, planning, or implementing additional response actions at or near the Site;

(6)    Assessing implementation of quality assurance and quality control practices as defined in the approved construction quality assurance quality control plan as provided in the Work Plan;

(7)    Implementing the Work pursuant to the conditions set forth in ¶ 66 (Work Takeover);

(8)    Inspecting and copying records, operating logs, contracts, or other documents maintained or generated by SDs or their agents, consistent with Section XVIII (Access to Information);

(9)    Assessing SDs' compliance with the CD;

(10)    Determining whether the Affected Property is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted under the CD; and

(11)    Implementing, monitoring, maintaining, reporting on, and enforcing any land, water, or other resource use restrictions and Institutional Controls.

(12)    General implementation of the remedy set forth in the September 5, 2018, ROD.

b.    **Land, Water, or Other Resource Use Restrictions.** Below is a list of land, water, or other resource use restrictions applicable to the Affected Property.

11

Institutional Controls will be used to support the long-term permanence and protectiveness of the remedy by limiting and/or preventing exposure to contamination and residual waste at the Site. Institutional Controls and the use of existing facility security procedures will prevent unauthorized intrusive activities or groundwater use. Uniform Environmental Covenants established by Kentucky Revised Statutes (KRS) 224.80 will be drafted and recorded to memorialize the land and activity use restrictions. The environmental covenants will include, at a minimum:

- Prohibit the use of groundwater beneath the Site, including for potable, agricultural, industrial and commercial purposes.
- Prohibit the use of the property within the Site area for purposes other than industrial uses.
- Notify the EPA, KDEP and other owners/operators within the boundary of the Site of any construction activities that may result in the disturbance of contaminated media.
- Except as contemplated in the ROD, prohibit the dredging of the river bottom within the Barge Slip or the Propane Dock area of the Site below an elevation of 288 feet above mean sea level (amsl) or installation of structures that may result in the exposure of contaminated media beneath the Tennessee River without the EPA notification and approval.

21.    **Proprietary Controls.** SDs shall, with respect to any Non-Settling Owner's Affected Property, use best efforts to secure Non-Settling Owner's cooperation in executing and recording Proprietary Controls; and Owner SD shall, with respect to Owner SD's Affected Property, execute and record, in accordance with the procedures of this ¶ 21, Proprietary Controls. Such Proprietary Controls shall: (i) grant a right of access to conduct any activity regarding the CD, including those activities listed in ¶ 20.a (Access Requirements); and (ii) grant the right to enforce the land, water, or other resource use restrictions set forth in ¶ 20.b (Land, Water, or Other Resource Use Restrictions).

a.    **Grantees.** The Proprietary Controls must be granted to one or more of the following persons and their representatives, as determined by the EPA: The United States, the State, SDs, and other appropriate grantees. Proprietary Controls in the nature of a Uniform Environmental Covenants Act ("UECA") document granted to persons other than the United States must include a designation that EPA (and/or the State as appropriate) is either an "agency" or a party expressly granted the right of access and the right to enforce the covenants allowing the EPA and/or the State to maintain the right to enforce the Proprietary Controls without acquiring an interest in real property.

b.    **Initial Title Evidence.** SDs shall, within 45 days after the Effective Date:

(1)    **Record Title Evidence.** Submit to the EPA a title insurance commitment or other title evidence acceptable to the EPA that: (i) names the proposed insured or the party in whose favor the title evidence runs, or the party who will hold the real estate interest, or if that party is uncertain, names the United States, the State, the SD, or "To Be Determined;" (ii) covers the Affected Property that is to be encumbered; (iii) demonstrates that the person

12

or entity that will execute and record the Proprietary Controls is the owner of such Affected Property; (iv) identifies all record matters that affect title to the Affected Property, including all prior liens, claims, rights (such as easements), mortgages, and other encumbrances (collectively, "Prior Encumbrances"); and (v) includes complete, legible copies of such Prior Encumbrances; and

(2)     Non-Record Title Evidence. Submit to the EPA a report of the results of an investigation, including a physical inspection of the Affected Property, which identifies non-record matters that could affect the title, such as unrecorded leases or encroachments.

c.     **Release or Subordination of Prior Liens, Claims, and Encumbrances**

(1)     SDs shall secure the release, subordination, modification, or relocation of all Prior Encumbrances on the title to the Affected Property revealed by the title evidence or otherwise known to any SD, unless the EPA waives this requirement as provided under ¶¶ 21.c(2)-(4).

(2)     SDs may, by the deadline under ¶ 21.b (Initial Title Evidence), submit an initial request for waiver of the requirements of ¶ 21.c(1) regarding one or more Prior Encumbrances, on the grounds that such Prior Encumbrances cannot defeat or adversely affect the rights to be granted by the Proprietary Controls and cannot interfere with the remedy or result in unacceptable exposure to Waste Material.

(3)     SDs may, within 90 days after the Effective Date, or if an initial waiver request has been filed, within 45 days after the EPA's determination on the initial waiver request, submit a final request for a waiver of the requirements of ¶ 21.c(1) regarding any particular Prior Encumbrance on the grounds that SDs could not obtain the release, subordination, modification, or relocation of such Prior Encumbrance despite best efforts.

(4)     The initial and final waiver requests must include supporting evidence including descriptions of and copies of the Prior Encumbrances and maps showing areas affected by the Prior Encumbrances. The final waiver request also must include evidence of efforts made to secure release, subordination, modification, or relocation of the Prior Encumbrances.

(5)     SDs shall complete their obligations under ¶ 21.c(1) regarding all Prior Encumbrances: within 180 days after the Effective Date; or if an initial waiver request has been filed, within 135 days after the EPA's determination on the initial waiver request; or if a final waiver request has been filed, within 90 days after the EPA's determination on the final waiver request.

d.     **Update to Title Evidence and Recording of Proprietary Controls**

(1)     SDs shall submit to the EPA for review and approval, by the deadline specified in ¶ 21.c(5), all draft Proprietary Controls and draft

13

instruments addressing Prior Encumbrances. The Proprietary Controls must be in substantially the form attached hereto as Appendix E.

(2)     Upon the EPA's approval of the proposed Proprietary Controls and instruments addressing Prior Encumbrances, SDs shall, within 15 days, update the original title insurance commitment (or other evidence of title acceptable to the EPA) under ¶ 21.b (Initial Title Evidence). If the updated title examination indicates that no liens, claims, rights, or encumbrances have been recorded since the effective date of the original commitment (or other title evidence), SDs shall secure the immediate recordation of the Proprietary Controls and instruments addressing Prior Encumbrances in the appropriate land records. Otherwise, SDs shall secure the release, subordination, modification, or relocation under ¶ 21.c(1), or the waiver under ¶¶ 21.c(2)-(4), regarding any newly discovered liens, claims, rights, and encumbrances, prior to recording the Proprietary Controls and instruments addressing Prior Encumbrances.

(3)     If SDs submitted a title insurance commitment under ¶ 21.b(1) (Record Title Evidence), then upon the recording of the Proprietary Controls and instruments addressing Prior Encumbrances, SDs shall obtain a title insurance policy that: (i) is consistent with the original title insurance commitment; (ii) is for $100,000 or other amount approved by the EPA; (iii) is issued to the United States, SDs, or other person approved by the EPA; and (iv) is issued on a current American Land Title Association (ALTA) form

(4)     SDs shall, within 30 days after recording the Proprietary Controls and instruments addressing Prior Encumbrances, or such other deadline approved by the EPA, provide to the United States and to all grantees of the Proprietary Controls: (i) certified copies of the recorded Proprietary Controls and instruments addressing Prior Encumbrances showing the clerk's recording stamps; and (ii) the title insurance policy(ies) or other approved form of updated title evidence dated as of the date of recording of the Proprietary Controls and instruments.

e.     SDs shall monitor, maintain, enforce, and annually report on all Proprietary Controls required under this CD.

f.     Owner SD shall not Transfer its Affected Property unless it has executed and recorded all Proprietary Controls and instruments addressing Prior Encumbrances regarding such Affected Property in accordance with this Paragraph.

22.     **Best Efforts.** As used in this Section, "best efforts" means the efforts that a reasonable person in the position of SDs would use so as to achieve the goal in a timely manner, including the cost of employing professional assistance and the payment of reasonable sums of money to secure access and/or use restriction agreements, Proprietary Controls, releases, subordinations, modifications, or relocations of Prior Encumbrances that affect the title to the Affected Property, as applicable. If SDs are unable to accomplish what is required through "best efforts" in a timely manner, they shall notify the EPA, and include a description of the steps taken to comply with the requirements. If the United States deems it appropriate, it may assist

14

SDs, or take independent action, in obtaining such access and/or use restrictions, Proprietary Controls, releases, subordinations, modifications, or relocations of Prior Encumbrances that affect the title to the Affected Property, as applicable. All costs incurred by the United States in providing such assistance or taking such action, including the cost of attorney time and the amount of monetary consideration or just compensation paid, constitute Future Response Costs to be reimbursed under Section X (Payments for Response Costs).

23.    If the EPA determines in a decision document prepared in accordance with the NCP that Institutional Controls in the form of state or local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices are needed, SDs shall cooperate with the EPA's [and the State's] efforts to secure and ensure compliance with such Institutional Controls.

24.    In the event of any Transfer of the Affected Property, unless the United States otherwise consents in writing, SDs shall continue to comply with their obligations under the CD, including their obligation to secure access and ensure compliance with any land, water, or other resource use restrictions regarding the Affected Property, and to implement, maintain, monitor, and report on Institutional Controls.

25.    Notwithstanding any provision of the CD, Plaintiff retain all of its access authorities and rights, as well as all of its rights to require land, water, or other resource use restrictions and Institutional Controls, including enforcement authorities related thereto, under CERCLA, RCRA, and any other applicable statute or regulations.

## IX.    FINANCIAL ASSURANCE

26.    In order to ensure completion of the Work, SDs shall secure financial assurance, initially in the amount of $89,000,000 ("Estimated Cost of the Work" adjusted for Net Present Value), for the benefit of the EPA. The financial assurance must be one or more of the mechanisms listed below, in a form substantially identical to the relevant sample documents available from the EPA or under the "Financial Assurance - Settlements" category on the Cleanup Enforcement Model Language and Sample Documents Database at https://cfpub.epa.gov/compliance/models/, and satisfactory to the EPA. SDs may use multiple mechanisms if they are limited to surety bonds guaranteeing payment, letters of credit, trust funds, and/or insurance policies.

a.    A surety bond guaranteeing payment and/or performance of the Work that is issued by a surety company among those listed as acceptable sureties on federal bonds as set forth in Circular 570 of the U.S. Department of the Treasury;

b.    An irrevocable letter of credit, payable to or at the direction of the EPA, that is issued by an entity that has the authority to issue letters of credit and whose letter-of-credit operations are regulated and examined by a federal or state agency;

c.    A trust fund established for the benefit of EPA that is administered by a trustee that has the authority to act as a trustee and whose trust operations are regulated and examined by a federal or state agency;

      d.     A policy of insurance that provides the EPA with acceptable rights as a beneficiary thereof and that is issued by an insurance carrier that has the authority to issue insurance policies in the applicable jurisdiction(s) and whose insurance operations are regulated and examined by a federal or state agency;

27.     SDs shall, within 30 days of the Effective Date, obtain the EPA's approval of the form of SDs' financial assurance. Within 30 days of such approval, SDs shall secure all executed and/or otherwise finalized mechanisms or other documents consistent with the EPA-approved form of financial assurance and shall submit such mechanisms and documents to the United States, and to the EPA [and the State] as specified in Section XX (Notices and Submissions).

28.     SDs shall diligently monitor the adequacy of the financial assurance. If any SD becomes aware of any information indicating that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, such SD shall notify the EPA of such information within 7 days. If the EPA determines that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, the EPA will notify the affected SD of such determination. SDs shall, within 30 days after notifying the EPA or receiving notice from the EPA under this Paragraph, secure and submit to the EPA for approval a proposal for a revised or alternative financial assurance mechanism that satisfies the requirements of this Section. The EPA may extend this deadline for such time as is reasonably necessary for the affected SD, in the exercise of due diligence, to secure and submit to the EPA a proposal for a revised or alternative financial assurance mechanism, not to exceed 60 days. SDs shall follow the procedures of ¶30 (Modification of Financial Assurance) in seeking approval of, and submitting documentation for, the revised or alternative financial assurance mechanism. SDs' inability to secure financial assurance in accordance with this Section does not excuse performance of any other obligation under this Settlement.

29.     **Access to Financial Assurance**

      a.     If the EPA issues a notice of implementation of a Work Takeover under ¶ 66.b, then, in accordance with any applicable financial assurance mechanism, the EPA is entitled to: (1) the performance of the Work; and/or (2) require that any funds guaranteed be paid in accordance with ¶ 29.d.

      b.     If the EPA is notified by the issuer of a financial assurance mechanism that it intends to cancel the mechanism, and the affected SD fails to provide an alternative financial assurance mechanism in accordance with this Section at least 30 days prior to the cancellation date, the funds guaranteed under such mechanism must be paid prior to cancellation in accordance with ¶ 29.d.

      c.     If, upon issuance of a notice of implementation of a Work Takeover under ¶ 66.b the EPA is unable for any reason to promptly secure the resources guaranteed under any applicable financial assurance mechanism and/or related standby funding commitment, whether in cash or in kind, to continue and complete the Work, then the EPA is entitled to demand an amount, as determined by the EPA, sufficient to cover the cost of the remaining Work to be

performed. SDs shall, within thirty days of such demand, pay the amount demanded as directed by the EPA.

        d.     Any amounts required to be paid under this ¶ 29 shall be, as directed by the EPA: (i) paid to the EPA in order to facilitate the completion of the Work by the EPA or by another person; or (ii) deposited into an interest-bearing account, established at a duly chartered bank or trust company that is insured by the FDIC, in order to facilitate the completion of the Work by another person. If payment is made to the EPA, the EPA may deposit the payment into the EPA Hazardous Substance Superfund or into the BF Goodrich Special Account within the EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by the EPA to the EPA Hazardous Substance Superfund.

        e.     All EPA Work Takeover costs not paid under this ¶ 29 must be reimbursed as Future Response Costs under Section X (Payments for Response Costs).

30.    **Modification of Amount, Form, or Terms of Financial Assurance.** SDs may submit, on any anniversary of the Effective Date or at any other time agreed to by the Parties, a request to reduce the amount, or change the form or terms, of the financial assurance mechanism. Any such request must be submitted to the EPA in accordance with ¶ 27, and must include an estimate of the cost of the remaining Work, an explanation of the bases for the cost calculation, and a description of the proposed changes, if any, to the form or terms of the financial assurance. The EPA will notify SDs of its decision to approve or disapprove a requested reduction or change pursuant to this Paragraph. SDs may reduce the amount of the financial assurance mechanism only in accordance with: (a) the EPA's approval; or (b) if there is a dispute, the agreement, final administrative decision, or final judicial decision resolving such dispute under Section XIII (Dispute Resolution). SDs may change the form or terms of the financial assurance mechanism only in accordance with the EPA's approval. Any decision made by the EPA on a request submitted under this Paragraph to change the form or terms of a financial assurance mechanism shall not be subject to challenge by SDs pursuant to the dispute resolution provisions of this CD or in any other forum. Within 30 days after receipt of the EPA's approval of, or the agreement or decision resolving a dispute relating to, the requested modifications pursuant to this Paragraph, SDs shall submit to the EPA documentation of the reduced, revised, or alternative financial assurance mechanism in accordance with ¶ 27.

31.    **Release, Cancellation, or Discontinuation of Financial Assurance.** SDs may release, cancel, or discontinue any financial assurance provided under this Section only: (a) if the EPA issues a Certification of Work Completion under ¶ 7.4 (Certification of Work Completion) of RAWP; (b) in accordance with the EPA's approval of such release, cancellation, or discontinuation; or (c) if there is a dispute regarding the release, cancellation or discontinuance of any financial assurance, in accordance with the agreement, final administrative decision, or final judicial decision resolving such dispute under Section XIII (Dispute Resolution).

## X.    PAYMENTS FOR RESPONSE COSTS

32.    Payments by SDs for Future Response Costs. SDs shall pay to the EPA all Future Response Costs not inconsistent with the NCP.

    a. **Periodic Bills.** On a periodic basis, the EPA will send SDs a bill requiring payment that includes a SCORPIOS Report, which includes direct and indirect costs incurred by the EPA, its contractors, subcontractors, and DOJ. Upon reasonable request from SDs, the EPA shall also provide related backup documentation. SDs shall make all payments within 30 days after SDs' receipt of each bill requiring payment, except as otherwise provided in ¶ 33, in accordance with c (instructions for future response cost payments).

    b. **Deposit of Future Response Costs Payments.** The total amount to be paid by SDs pursuant to ¶ 32.a (Periodic Bills) shall be deposited by the EPA in the B.F. Goodrich Superfund Site Special Account to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by the EPA to the EPA Hazardous Substance Superfund, provided, however, that EPA may deposit a Future Response Costs payment directly into the EPA Hazardous Substance Superfund if, at the time the payment is received, the EPA estimates that the B.F. Goodrich Superfund Site Special Account balance is sufficient to address currently anticipated future response actions to be conducted or financed by the EPA at or in connection with the Site.

    c. **Future Response** Costs Payments and Stipulated Penalties NOTE: Choose one of the four options below for payment by EFT, by ACH, **online,** or by check.

      (1) For all payments subject to this ¶ 32.c, SDs shall make such payment by Fedwire EFT, referencing the Site/Spill ID and DJ numbers. The Fedwire EFT payment must be sent as follows:

        Federal Reserve Bank of New York
        ABA = 021030004
        Account = 68010727
        SWIFT address = FRNYUS33
        33 Liberty Street
        New York NY 10045
        Field Tag 4200 of the Fedwire message should read
        "D 68010727 Environmental Protection Agency"

      (2) For all payments subject to this ¶ 32.c, SD shall make such payment by Automated Clearinghouse (ACH) payment as follows:

        PNC Bank
        808 17th Street, NW
        Washington, DC 20074
        Contact – Jesse White 301-887-6548
        ABA = 051036706
        Transaction Code 22 - checking
        Environmental Protection Agency
        Account 310006
        CTX Format

(3)      For all payments subject to this ¶ 32.c, SD shall make such payment at https://www.pay.gov to the U.S. EPA account in accordance with instructions to be provided to SDs by the EPA following lodging of the CD.

(4)      For all payments subject to this ¶ 32.c, SD shall make such payment by official bank check(s) made payable to the "EPA Hazardous Substance Superfund," referencing the name and address of the party making the payment. SDs shall send the check(s) to:

> U.S. Environmental Protection Agency
> Superfund Payments
> Cincinnati Finance Center
> P.O. Box 979076
> St. Louis, MO 63197-9000

(5)      For all payments made under this ¶ 32.c, SDs must include references to the Site/Spill ID and DJ numbers. At the time of any payment required to be made in accordance with ¶ 32.c, SDs shall send notices that payment has been made to the United States, EPA, and the EPA Cincinnati Finance Center, all in accordance with ¶ 87. All notices must include references to the Site/Spill ID and DJ numbers.

33.      **Contesting Future Response Costs.** SDs may submit a Notice of Dispute, initiating the procedures of Section XIII (Dispute Resolution), regarding any Future Response Costs billed under ¶ 32 (Payments by SDs for Future Response Costs) if they determine that the EPA has made a mathematical error or included a cost item that is not within the definition of Future Response Costs, or if they believe the EPA incurred excess costs as a direct result of an EPA action that was inconsistent with a specific provision or provisions of the NCP. Such Notice of Dispute shall be submitted in writing within 30 days after receipt of the bill and must be sent to the United States pursuant to Section XX (Notices and Submissions). Such Notice of Dispute shall specifically identify the contested Future Response Costs and the basis for objection. If SDs submit a Notice of Dispute, SDs shall within the 30-day period, also as a requirement for initiating the dispute, (a) pay all uncontested Future Response Costs to the United States, and (b) establish, in a duly chartered bank or trust company, an interest-bearing escrow account that is insured by the Federal Deposit Insurance Corporation (FDIC), and remit to that escrow account funds equivalent to the amount of the contested Future Response Costs. SDs shall send to the United States, as provided in Section XX (Notices and Submissions), a copy of the transmittal letter and check paying the uncontested Future Response Costs, and a copy of the correspondence that establishes and funds the escrow account, including, but not limited to, information containing the identity of the bank and bank account under which the escrow account is established as well as a bank statement showing the initial balance of the escrow account. If the United States prevails in the dispute, SDs shall pay the sums due (with accrued interest) to the United States within 7 days after the resolution of the dispute. If SDs prevail concerning any aspect of the contested costs, SDs shall pay that portion of the costs (plus associated accrued interest) for which they did not prevail to the United States within 7 days after

19

the resolution of the dispute. SDs shall be disbursed any balance of the escrow account. All payments to the United States under this Paragraph shall be made in accordance with ¶¶ 32.c (instructions for future response cost payments). The dispute resolution procedures set forth in this Paragraph in conjunction with the procedures set forth in Section XIII (Dispute Resolution) shall be the exclusive mechanisms for resolving disputes regarding SDs' obligation to reimburse the United States for their Future Response Costs.

34.     **Interest.** In the event that any payment for Future Response Costs required under this Section is not made by the date required, SDs shall pay Interest on the unpaid balance. The Interest on Future Response Costs shall begin to accrue on the date of the bill. The Interest shall accrue through the date of SDs' payment. Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to Plaintiffs by virtue of SDs' failure to make timely payments under this Section including, but not limited to, payment of stipulated penalties pursuant to Section XIV (Stipulated Penalties).

## XI.     INDEMNIFICATION AND INSURANCE

35.     **SDs' Indemnification of the United States**

a.      The United States does not assume any liability by entering into this CD or by virtue of any designation of SDs as the EPA's authorized representatives under Section 104(e) of CERCLA, 42 U.S.C. § 9604(e). SDs shall indemnify, save, and hold harmless the United States and its officials, agents, employees, contractors, subcontractors, and representatives for or from any and all claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of SDs, their officers, directors, employees, agents, contractors, subcontractors, and any persons acting on SDs' behalf or under their control, in carrying out activities pursuant to this CD, including, but not limited to, any claims arising from any designation of SDs as the EPA's authorized representatives under Section 104(e) of CERCLA. Further, SDs agree to pay the United States all costs it incurs including, but not limited to, attorneys' fees and other expenses of litigation and settlement arising from, or on account of, claims made against the United States based on negligent or other wrongful acts or omissions of SDs, their officers, directors, employees, agents, contractors, subcontractors, and any persons acting on their behalf or under their control, in carrying out activities pursuant to this CD. The United States shall not be held out as a party to any contract entered into by or on behalf of SDs in carrying out activities pursuant to this CD. Neither SDs nor any such contractor shall be considered an agent of the United States.

b.      The United States shall give SDs notice of any claim for which the United States plans to seek indemnification pursuant to this ¶ 35 and shall consult with SDs prior to settling such claim.

36.     SDs covenant not to sue and agree not to assert any claims or causes of action against the United States for damages or reimbursement or for setoff of any payments made or to be made to the United States arising from or on account of any contract, agreement, or arrangement between any one or more of SDs and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays. In addition, SDs shall indemnify, save and hold harmless the United States with respect to any and

20

all claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between any one or more of SDs and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays.

37.     **Insurance.** No later than 15 days before commencing any on-site Work. SDs shall secure, and shall maintain until the first anniversary after issuance of the EPA's Certification of RA Completion pursuant to Section 7.4 (Certification of RA Completion) of the RAWP commercial general liability insurance with limits of liability of $1 million per occurrence, automobile liability insurance with limits of liability of $1 million per accident, and umbrella liability insurance with limits of liability of $5 million in excess of the required commercial general liability and automobile liability limits, naming the United States as additional insureds with respect to all liability arising out of the activities performed by or on behalf of SDs pursuant to this CD. In addition, for the duration of this CD, SDs shall satisfy, or shall ensure that their contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of SDs in furtherance of this CD. Prior to commencement of the Work, SDs shall provide to the EPA certificates of such insurance and a copy of each insurance policy. SDs shall resubmit such certificates and copies of policies each year on the anniversary of the Effective Date. If SDs demonstrate by evidence satisfactory to the EPA that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering the same risks but in a lesser amount, then, with respect to that contractor or subcontractor, SDs need provide only that portion of the insurance described above that is not maintained by the contractor or subcontractor. SDs shall ensure that all submittals to the EPA under this Paragraph identify the BF Goodrich Site, Calvert City, Kentucky and the civil action number of this case.

## XII.   FORCE MAJEURE

38.     "Force majeure," for purposes of this CD, is defined as any event arising from causes beyond the control of SDs, of any entity controlled by SDs, or of SDs' contractors that delays or prevents the performance of any obligation under this CD despite SDs' best efforts to fulfill the obligation. The requirement that SDs exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure and best efforts to address the effects of any potential force majeure (a) as it is occurring and (b) following the potential force majeure such that the delay and any adverse effects of the delay are minimized to the greatest extent possible. "Force majeure" does not include financial inability to complete the Work or a failure to achieve the Performance Standards.

39.     If any event occurs or has occurred that may delay the performance of any obligation under this CD for which SDs intend or may intend to assert a claim of force majeure, SDs shall notify the EPA's Project Coordinator orally or, in his or her absence, the EPA's Alternate Project Coordinator or, in the event both of the EPA's designated representatives are unavailable, the Director of the Superfund & Emergency Management Division, EPA Region 4, within five days of when SDs first knew that the event might cause a delay. Within 21 days thereafter, SDs shall provide in writing to the EPA an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; SDs' rationale for attributing such delay to a force

majeure; and a statement as to whether, in the opinion of SDs, such event may cause or contribute to an endangerment to public health or welfare, or the environment. SDs shall include with any notice all available documentation supporting their claim that the delay was attributable to a force majeure. SDs shall be deemed to know of any circumstance of which SDs, any entity controlled by SDs, or SDs' contractors or subcontractors knew or should have known. Failure to comply with the above requirements regarding an event shall preclude SDs from asserting any claim of force majeure regarding that event, provided, however, that if the EPA, despite the late or incomplete notice, is able to assess to its satisfaction whether the event is a force majeure under ¶ 38 and whether SDs have exercised their best efforts under ¶ 38, the EPA may, in its unreviewable discretion, excuse in writing SDs' failure to submit timely or complete notices under this Paragraph.

40.     If the EPA agrees that the delay or anticipated delay is attributable to a force majeure, the time for performance of the obligations under this CD that are affected by the force majeure will be extended by the EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure shall not, of itself, extend the time for performance of any other obligation. If the EPA, after a reasonable opportunity for review and comment by the State, does not agree that the delay or anticipated delay has been or will be caused by a force majeure, the EPA will notify SDs in writing of its decision. If the EPA agrees that the delay is attributable to a force majeure, the EPA will notify SDs in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure.

41.     If SDs elect to invoke the dispute resolution procedures set forth in Section XIII (Dispute Resolution) regarding the EPA's decision, they shall do so no later than 15 days after receipt of the EPA's notice. In any such proceeding, SDs shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that SDs complied with the requirements of ¶¶ 38 and 39. If SDs carry this burden, the delay at issue shall be deemed not to be a violation by SDs of the affected obligation of this CD identified to the EPA and the Court.

42.     The failure by the EPA to timely complete any obligation under the CD or under the Work Plan is not a violation of the CD, provided, however, that if such failure prevents SDs from meeting one or more deadlines in the Work Plan, SDs may seek relief under this Section.

## XIII.  DISPUTE RESOLUTION

43.     Unless otherwise expressly provided for in this CD, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes regarding this CD. However, the procedures set forth in this Section shall not apply to actions by the United States to enforce obligations of SDs that have not been disputed in accordance with this Section.

44.     A dispute shall be considered to have arisen when one party sends the other parties a written Notice of Dispute. Any dispute regarding this CD shall in the first instance be the subject of informal negotiations between the parties to the dispute. The period for informal

22

negotiations shall not exceed 20 days from the time the dispute arises, unless it is modified by written agreement of the parties to the dispute.

45.   **Statements of Position**

a.   In the event that the parties cannot resolve a dispute by informal negotiations under the preceding Paragraph, then the position advanced by the EPA shall be considered binding unless, within 21 days after the conclusion of the informal negotiation period, SDs invoke the formal dispute resolution procedures of this Section by serving on the United States a written Statement of Position on the matter in dispute, including, but not limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by SDs. The Statement of Position shall specify SDs' position as to whether formal dispute resolution should proceed under ¶¶ 46 (Record Review) or 47.

b.   Within 45 days after receipt of SDs' Statement of Position, the EPA will serve on SDs its Statement of Position, including, but not limited to, any factual data, analysis, or opinion supporting that position and all supporting documentation relied upon by the EPA. The EPA's Statement of Position shall include a statement as to whether formal dispute resolution should proceed under ¶ 46 (Record Review) or 47. Within 45 days after receipt of the EPA's Statement of Position, SDs must submit a reply, otherwise the matter will be deemed closed.

c.   If there is disagreement between the EPA and SDs as to whether dispute resolution should proceed under ¶¶ 46 (Record Review) or 47, the parties to the dispute shall follow the procedures set forth in the Paragraph determined by the EPA to be applicable. However, if SDs ultimately appeal to the Court to resolve the dispute, the Court shall determine which Paragraph is applicable in accordance with the standards of applicability set forth in ¶¶ 46 and 47.

46.   Record Review. Formal dispute resolution for disputes pertaining to the selection or adequacy of any response action and all other disputes that are accorded review on the administrative record under applicable principles of administrative law shall be conducted pursuant to the procedures set forth in this Paragraph. For purposes of this Paragraph, the adequacy of any response action includes, without limitation, the adequacy or appropriateness of plans, procedures to implement plans, or any other items requiring approval by the EPA under this CD, and the adequacy of the performance of response actions taken pursuant to this CD. Nothing in this CD shall be construed to allow any dispute by SDs regarding the validity of the ROD's provisions.

a.   An administrative record of the dispute shall be maintained by the EPA and shall contain all statements of position, including supporting documentation, submitted pursuant to this Section. Where appropriate, the EPA may allow submission of supplemental statements of position by the parties to the dispute.

b.   The Director of the Superfund & Emergency Management Division, EPA Region 4, will issue a final administrative decision resolving the dispute based on the

administrative record described in ¶ 46.a. This decision shall be binding upon SDs, subject only to the right to seek judicial review pursuant to ¶¶ 46.c and 46.d.

        c.      Any administrative decision made by the EPA pursuant to ¶ 46.b shall be reviewable by this Court, provided that a motion for judicial review of the decision is filed by SDs with the Court and served on all Parties within 10 days after receipt of the EPA's decision. The motion shall include a description of the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of this CD. The United States may file a response to SDs' motion.

        d.      In proceedings on any dispute governed by this Paragraph, SDs shall have the burden of demonstrating that the decision of the Superfund & Emergency Management Division Director is arbitrary and capricious or otherwise not in accordance with law. Judicial review of the EPA's decision shall be on the administrative record compiled pursuant to ¶ 46.a.

47.      Formal dispute resolution for disputes that neither pertain to the selection or adequacy of any response action nor are otherwise accorded review on the administrative record under applicable principles of administrative law, shall be governed by this Paragraph.

        a.      The Director of the Superfund & Emergency Management Division, EPA Region 4, will issue a final decision resolving the dispute based on the statements of position and reply, if any, served under ¶ 45. The Superfund & Emergency Management Division Director's decision shall be binding on SDs unless, within 10 days after receipt of the decision, SDs file with the Court and serve on the parties a motion for judicial review of the decision setting forth the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of the CD. The United States may file a response to SDs' motion.

        b.      Notwithstanding ¶ M (CERCLA § 113(j) record review of ROD and Work) of Section I (Background), judicial review of any dispute governed by this Paragraph shall be governed by applicable principles of law.

48.      The invocation of formal dispute resolution procedures under this Section does not extend, postpone, or affect in any way any obligation of SDs under this CD, except as provided in ¶ 33 (Contesting Future Response Costs), as agreed by the EPA, or as determined by the Court. Stipulated penalties with respect to the disputed matter shall continue to accrue, but payment shall be stayed pending resolution of the dispute, as provided in ¶ 56. Notwithstanding the stay of payment, stipulated penalties shall accrue from the first day of noncompliance with any applicable provision of this CD. In the event that SDs do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XIV (Stipulated Penalties).

## XIV.  STIPULATED PENALTIES

49.      SDs shall be liable to the United States for stipulated penalties in the amounts set forth in ¶¶ 50.a and 51 for failure to comply with the obligations specified in ¶¶ 50.b and 51, unless excused under Section XII (Force Majeure). "Comply" as used in the previous sentence includes compliance by SDs with all applicable requirements of this CD, within the deadlines

established under this CD. If an initially submitted or resubmitted deliverable contains a material defect, and the deliverable is disapproved or modified by the EPA under RAWP Section 7.8 due to such material defect, then the material defect shall constitute a lack of compliance for purposes of this Paragraph.

50.     Stipulated Penalty Amounts - Payments, Financial Assurance, Major Deliverables, and Other Milestones

a.     The following stipulated penalties shall accrue per violation per day for any noncompliance identified in ¶ 50.b:

| Period of Noncompliance | Penalty Per Violation Per Day |
| --- | --- |
| 1st through 14th day | $1500 |
| 15th through 30th day | $1750 |
| 31st day and beyond | $2000 |

b.     **Obligations**

(1)     Payment of any amount due under Section X (Payments for Response Costs).

(2)     Establishment and maintenance of financial assurance in accordance with Section IX (Financial Assurance).

(3)     Establishment of an escrow account to hold any disputed Future Response Costs under ¶ 33 (Contesting Future Response Costs).

(4)     Failure to submit documents listed in the approved RA Work Plan.

51.     **Stipulated Penalty Amounts — Other Deliverables.** The following stipulated penalties shall accrue per violation per day for failure to submit timely or adequate deliverables pursuant to the CD other than those specified in Paragraph 50.b:

| Period of Noncompliance | Penalty Per Violation Per Day |
| --- | --- |
| 1st through 14th day | $1500 |
| 15th through 30th day | $1750 |
| 31st day and beyond | $2000 |

52.     In the event that the EPA assumes performance of a portion or all of the Work pursuant to ¶ 66 (Work Takeover), SDs shall be liable for a stipulated penalty in the amount of $75,000. Stipulated penalties under this Paragraph are in addition to the remedies available under ¶¶ 29 (Access to Financial Assurance) and 66 (Work Takeover).

53.     All penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity. However, stipulated penalties shall not accrue: (a) with respect to a deficient submission under Section 7.8 (Approval of

Deliverables) of the RAWP, during the period, if any, beginning on the 31st day after the EPA's receipt of such submission until the date that the EPA notifies SDs of any deficiency; (b) with respect to a decision by the Director of the Superfund & Emergency Management Division, EPA Region 4, under ¶ 46.b or 47.a of Section XIII (Dispute Resolution), during the period, if any, beginning on the 21st day after the date that SDs' reply to the EPA's Statement of Position is received until the date that the Director issues a final decision regarding such dispute; or (c) with respect to judicial review by this Court of any dispute under Section XIII (Dispute Resolution), during the period, if any, beginning on the 31st day after the Court's receipt of the final submission regarding the dispute until the date that the Court issues a final decision regarding such dispute. Nothing in this CD shall prevent the simultaneous accrual of separate penalties for separate violations of this CD.

54.     Following the EPA's determination that SDs have failed to comply with a requirement of this CD, the EPA may give SDs written notification of the same and describe the noncompliance. The EPA [and the State] may send SDs a written demand for payment of the penalties. However, penalties shall accrue as provided in the preceding Paragraph regardless of whether the EPA has notified SDs of a violation.

55.     All penalties accruing under this Section shall be due and payable to the United States within 30 days after SDs' receipt from the EPA of a demand for payment of the penalties, unless SDs invoke the Dispute Resolution procedures under Section XIII (Dispute Resolution) within the 30-day period. All payments to the United States under this Section shall indicate that the payment is for stipulated penalties and shall be made in accordance with ¶ 32.c (instructions for future response cost payments).

56.     Penalties shall continue to accrue as provided in ¶ 53 during any dispute resolution period, but need not be paid until the following:

a.     If the dispute is resolved by agreement of the parties or by a decision of the EPA that is not appealed to this Court, accrued penalties determined to be owed shall be paid to the EPA [and the State] within 15 days after the agreement or the receipt of the EPA's decision or order;

b.     If the dispute is appealed to this Court and the United States prevails in whole or in part, SDs shall pay all accrued penalties determined by the Court to be owed to the EPA within 60 days after receipt of the Court's decision or order, except as provided in ¶ 56.c;

c.     If the District Court's decision is appealed by any Party, SDs shall pay all accrued penalties determined by the District Court to be owed to the United States into an interest-bearing escrow account, established at a duly chartered bank or trust company that is insured by the FDIC, within 60 days after receipt of the Court's decision or order. Penalties shall be paid into this account as they continue to accrue, at least every 60 days. Within 15 days after receipt of the final appellate court decision, the escrow agent shall pay the balance of the account to the EPA or to SDs to the extent that they prevail.

57.     If SDs fail to pay stipulated penalties when due, SDs shall pay Interest on the unpaid stipulated penalties as follows: (a) if SDs have timely invoked dispute resolution such

that the obligation to pay stipulated penalties has been stayed pending the outcome of dispute resolution, Interest shall accrue from the date stipulated penalties are due pursuant to ¶ 56 until the date of payment; and (b) if SDs fail to timely invoke dispute resolution, Interest shall accrue from the date of demand under ¶ 55 until the date of payment. If SDs fail to pay stipulated penalties and Interest when due, the United States or the State may institute proceedings to collect the penalties and Interest.

58.     The payment of penalties and Interest, if any, shall not alter in any way SDs' obligation to complete the performance of the Work required under this CD.

59.     Nothing in this CD shall be construed as prohibiting, altering, or in any way limiting the ability of the United States to seek any other remedies or sanctions available by virtue of SDs' violation of this CD or of the statutes and regulations upon which it is based, including, but not limited to, penalties pursuant to Section 122(*l*) of CERCLA, 42 U.S.C. § 9622(*l*), provided, however, that the United States shall not seek civil penalties pursuant to Section 122(*l*) of CERCLA for any violation for which a stipulated penalty is provided in this CD, except in the case of a willful violation of this CD.

60.     Notwithstanding any other provision of this Section, the United States may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this CD.

## XV.    COVENANTS BY PLAINTIFF

61.     Covenants for SDs by United States. Except as provided in ¶¶ 62, 63 (United States' Pre- and Post-Certification Reservations), and 65 (General Reservations of Rights), the United States covenants not to sue or to take administrative action against SDs pursuant to either Sections 106 and 107(a) of CERCLA relating to the Site or Section 7003 of RCRA, 42 U.S.C. § 6973 relating to the Work. Except with respect to future liability, these covenants shall take effect upon the Effective Date. With respect to future liability, these covenants shall take effect upon Certification of RA Completion by the EPA pursuant to Section 7.4 (Certification of RA Completion) of the RAWP. These covenants are conditioned upon the satisfactory performance by SDs of their obligations under this CD. These covenants extend only to SDs and do not extend to any other person.

62.     **United States' Pre-Certification Reservations.** Notwithstanding any other provision of this CD, the United States reserves, and this CD is without prejudice to, the right to institute proceedings in this action or in a new action, and/or to issue an administrative order, seeking to compel SDs, to perform further response actions relating to the Site and/or to pay the United States for additional costs of response if, (a) prior to Certification of RA Completion, (1) conditions at the Site, previously unknown to the EPA, are discovered, or (2) information, previously unknown to the EPA, is received, in whole or in part, and (b) the EPA determines that these previously unknown conditions or information together with any other relevant information indicates that the RA is not protective of human health or the environment.

27

63.    **United States' Post-Certification Reservations.** Notwithstanding any other provision of this CD, the United States reserves, and this CD is without prejudice to, the right to institute proceedings in this action or in a new action, and/or to issue an administrative order, seeking to compel SDs to perform further response actions relating to the Site and/or to pay the United States for additional costs of response if, (a) subsequent to Certification of RA Completion, (1) conditions at the Site, previously unknown to the EPA, are discovered, or (2) information, previously unknown to the EPA, is received, in whole or in part, and (b) the EPA determines that these previously unknown conditions or this information together with other relevant information indicate that the RA is not protective of human health or the environment.

64.    For purposes of ¶ 62 (United States' Pre-Certification Reservations), the information and the conditions known to the EPA will include only that information and those conditions known to the EPA as of the date the ROD was signed and set forth in the ROD for the Site and the administrative record supporting the ROD. For purposes of ¶ 63 (United States' Post-Certification Reservations), the information and the conditions known to EPA shall include only that information and those conditions known to the EPA as of the date of Certification of RA Completion and set forth in the ROD, the administrative record supporting the ROD, the post-ROD administrative record, or in any information received by the EPA pursuant to the requirements of this CD prior to Certification of RA Completion.

65.    **General Reservations of Rights.** The United States reserves, and this CD is without prejudice to, all rights against SDs with respect to all matters not expressly included within Plaintiff's covenants. Notwithstanding any other provision of this CD, the United States reserves all rights against SDs with respect to:

a.    liability for failure by SDs to meet a requirement of this CD;

b.    liability arising from the past, present, or future disposal, release, or threat of release of Waste Material outside of the Site;

c.    liability based on the ownership of the Site by SDs when such ownership commences after signature of this CD by SDs;

d.    liability based on the operation of the Site by SDs when such operation commences after signature of this CD by SDs and does not arise solely from SDs' performance of the Work;

e.    liability based on SDs' transportation, treatment, storage, or disposal, or arrangement for transportation, treatment, storage, or disposal of Waste Material at or in connection with the Site, other than as provided in the ROD, the Work, or otherwise ordered by the EPA, after signature of this CD by SDs;

f.    liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;

g.    criminal liability;

28

h.     liability for violations of federal or state law that occur during or after implementation of the Work; and

i.     liability, prior to achievement of Performance Standards, for additional response actions that the EPA determines are necessary to achieve and maintain Performance Standards or to carry out and maintain the effectiveness of the remedy set forth in the ROD, but that cannot be required pursuant to ¶ 13 (Modification of Work Plan or Related Deliverables);

66.     **Work Takeover**

a.     In the event the EPA determines that SDs: (1) have ceased implementation of any portion of the Work; (2) are seriously or repeatedly deficient or late in their performance of the Work; or (3) are implementing the Work in a manner that may cause an endangerment to human health or the environment, the EPA may issue a written notice ("Work Takeover Notice") to SDs. Any Work Takeover Notice issued by EPA will specify the grounds upon which such notice was issued and will provide SDs a period of **10** days within which to remedy the circumstances giving rise to the EPA's issuance of such notice.

b.     If, after expiration of the 10-day notice period specified in ¶ 66.a, SDs have not remedied to the EPA's satisfaction the circumstances giving rise to the EPA's issuance of the relevant Work Takeover Notice, the EPA may at any time thereafter assume the performance of all or any portion(s) of the Work as the EPA deems necessary ("Work Takeover"). The EPA will notify SDs in writing (which writing may be electronic) if the EPA determines that implementation of a Work Takeover is warranted under this ¶ 66.b. Funding of Work Takeover costs is addressed under ¶ 29 (Access to Financial Assurance).

c.     SDs may invoke the procedures set forth in ¶ 46 (Record Review), to dispute the EPA's implementation of a Work Takeover under ¶ 66.b. However, notwithstanding SDs' invocation of such dispute resolution procedures, and during the pendency of any such dispute, the EPA may in its sole discretion commence and continue a Work Takeover under ¶ 66.b until the earlier of (1) the date that SDs remedy, to the EPA's satisfaction, the circumstances giving rise to the EPA's issuance of the relevant Work Takeover Notice, or (2) the date that a final decision is rendered in accordance with ¶ 46 (Record Review) requiring the EPA to terminate such Work Takeover.

67.     Notwithstanding any other provision of this CD, the United States and the State retain[s] all authority and reserve[s] all rights to take any and all response actions authorized by law.

## XVI.   COVENANTS BY SDs

68.     Covenants by SDs. Subject to the reservations in ¶ 70, SDs covenant not to sue and agree not to assert any claims or causes of action against the United States with respect to the Site and this CD, including, but not limited to:

a.     any direct or indirect claim for reimbursement from the EPA Hazardous Substance Superfund through CERCLA §§ 106(b)(2), 107, 111, 112 or 113, or any other provision of law;

29

b.     any claims under CERCLA §§ 107 or 113, RCRA Section 7002(a) 42 U.S.C. § 6972(a), or state law regarding the Site the Work, past response actions regarding the Site, Future Response Costs, and this CD; or

c.     any claims arising out of response actions at or in connection with the Site, including any claim under the United States Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, or at common law.

69.     Except as provided in ¶¶ 72 (Waiver of Claims by SDs) and 78 (Res Judicata and Other Defenses), the covenants in this Section shall not apply if the United States brings a cause of action or issues an order pursuant to any of the reservations in Section XV (Covenants by Plaintiff), other than in ¶¶ 65.a (claims for failure to meet a requirement of the CD), 65.g (criminal liability), and 65.h (violations of federal/state law during or after implementation of the Work), but only to the extent that SDs' claims arise from the same response action, response costs, or damages that the United States is seeking pursuant to the applicable reservation.

70.     SDs reserve, and this CD is without prejudice to, claims against the United States, subject to the provisions of Chapter 171 of Title 28 of the United States Code, and brought pursuant to any statute other than CERCLA or RCRA and for which the waiver of sovereign immunity is found in a statute other than CERCLA or RCRA, for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States, as that term is defined in 28 U.S.C. § 2671, while acting within the scope of his or her office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. However, the foregoing shall not include any claim based on the EPA's selection of response actions, or the oversight or approval of SDs' deliverables or activities.

71.     Nothing in this CD shall be deemed to constitute approval or preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

72.     **Waiver of Claims by SDs**

a.     SDs agree not to assert any claims and to waive all claims or causes of action (including but not limited to claims or causes of action under Sections 107(a) and 113 of CERCLA) that they may have:

(1)     **De Micromis Waiver.** For all matters relating to the Site against any person where the person's liability to SDs with respect to the Site is based solely on having arranged for disposal or treatment, or for transport for disposal or treatment, of hazardous substances at the Site, or having accepted for transport for disposal or treatment of hazardous substances at the Site, if all or part of the disposal, treatment, or transport occurred before April 1, 2001, and the total amount of material containing hazardous substances contributed by such person to the Site was less than 110 gallons of liquid materials or 200 pounds of solid materials;

30

b.   **Exceptions to Waiver.**

(1)   The waiver under this ¶ 72 shall not apply with respect to any defense, claim, or cause of action that a SD may have against any person otherwise covered by such waiver if such person asserts a claim or cause of action relating to the Site against such SD.

(2)   The waiver under ¶ 72 (De Micromis Waiver) shall not apply to any claim or cause of action against any person otherwise covered by such waiver if EPA determines that: (i) the materials containing hazardous substances contributed to the Site by such person contributed significantly or could contribute significantly, either individually or in the aggregate, to the cost of the response action or natural resource restoration at the Site; or (ii) such person has failed to comply with any information request or administrative subpoena issued pursuant to Section 104(e) or 122(e)(3)(B) of CERCLA, 42 U.S.C. § 9604(e) or 9622(e)(3)(B), or Section 3007 of RCRA, 42 U.S.C. § 6927, or has impeded or is impeding, through action or inaction, the performance of a response action or natural resource restoration with respect to the Site; or if (iii) such person has been convicted of a criminal violation for the conduct to which the waiver would apply and that conviction has not been vitiated on appeal or otherwise.

## XVII.  EFFECT OF SETTLEMENT; CONTRIBUTION

73.   Except as provided in ¶ 72 (Waiver of Claims by SDs), nothing in this CD shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this CD. Except as provided in Section XVI (Covenants by SDs), each of the Parties expressly reserves any and all rights (including, but not limited to, pursuant to Section 113 of CERCLA, 42 U.S.C. § 9613), defenses, claims, demands, and causes of action that each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Site against any person not a Party hereto. Nothing in this CD diminishes the right of the United States, pursuant to Section 113(f)(2) and (3) of CERCLA, 42 U.S.C. § 9613(f)(2)-(3), to pursue any such persons to obtain additional response costs or response action and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2). As set forth in ¶ 6, nothing in this CD alters, modifies, amends or supersedes in any way the agreements between or among any of the SDs, or any arbitration awards or court judgments pertaining to any of the SDs in connection with the Site.

74.   The Parties agree, and by entering this CD this Court finds, that this CD constitutes a judicially-approved settlement pursuant to which each SD has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(0(2), and is entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA, or as may be otherwise provided by law, for the "matters addressed" in this CD. The "matters addressed" in this CD are all response actions taken or to be taken and all response costs incurred or to be incurred, at or in connection with the Site, by the United States or any other person, except for the State; provided, however, that if the United States exercises rights under the reservations in Section XV (Covenants by Plaintiff), other than in ¶¶ 65.a (claims for failure to meet a requirement of the

31

CD), 65.g (criminal liability), or 65.h (violations of federal/state law during or after implementation of the Work), the "matters addressed" in this CD will no longer include those response costs or response actions that are within the scope of the exercised reservation.

75.     The Parties further agree, and by entering this CD this Court finds, that the complaint filed by the United States in this action is a civil action within the meaning of Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), and that this CD constitutes a judicially-approved settlement pursuant to which each Settling Defendant has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).

76.     Each SD shall, with respect to any suit or claim brought by it for matters related to this CD, notify the United States in writing no later than 60 days prior to the initiation of such suit or claim.

77.     Each SD shall, with respect to any suit or claim brought against it for matters related to this CD, notify in writing the United States within 10 days after service of the complaint on such SD. In addition, each SD shall notify the United States within 10 days after service or receipt of any Motion for Summary Judgment and within 10 days after receipt of any order from a court setting a case for trial.

78.     **Res Judicata and Other Defenses.** In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, recovery of response costs, or other appropriate relief relating to the Site, SDs shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case; provided, however, that nothing in this Paragraph affects the enforceability of the covenants not to sue set forth in Section XV (Covenants by Plaintiffs).

## XVIII. ACCESS TO INFORMATION

79.     SDs shall provide to the EPA, upon request, copies of all records, reports, documents, and other information (including records, reports, documents, and other information in electronic form) (hereinafter referred to as "Records") within SDs' possession or control or that of their contractors or agents relating to activities at the Site or to the implementation of this CD, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information regarding the Work. SDs shall also make available to the EPA and the State, for purposes of investigation, information gathering, or testimony, their employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.

80.     **Privileged and Protected Claims**

a.     SDs may assert that all or part of a Record requested by Plaintiffs is privileged or protected as provided under federal law, in lieu of providing the Record, provided SDs comply with ¶ 80.b, and except as provided in ¶ 80.c.

32

b.     If SDs assert a claim of privilege or protection, they shall provide Plaintiffs with the following information regarding such Record: its title; its date; the name, title, affiliation (e.g., company or firm), and address of the author, of each addressee, and of each recipient; a description of the Record's contents; and the privilege or protection asserted. If a claim of privilege or protection applies only to a portion of a Record, SDs shall provide the Record to Plaintiffs in redacted form to mask the privileged or protected portion only. SDs shall retain all Records that they claim to be privileged or protected until Plaintiff has had a reasonable opportunity to dispute the privilege or protection claim and any such dispute has been resolved in the SDs' favor.

c.     SDs may make no claim of privilege or protection regarding: (1) any data regarding the Site, including, but not limited to, all sampling, analytical, monitoring, hydrogeological, scientific, chemical, radiological or engineering data, or the portion of any other Record that evidences conditions at or around the Site; or (2) the portion of any Record that SDs are required to create or generate pursuant to this CD.

81.     **Business Confidential Claims.** SDs may assert that all or part of a Record provided to Plaintiff's] under this Section or Section XIX (Retention of Records) is business confidential to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b). SDs shall segregate and clearly identify all Records or parts thereof submitted under this CD for which SDs assert business confidentiality claims. Records that SDs claim to be confidential business information will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B. If no claim of confidentiality accompanies Records when they are submitted to the EPA, or if the EPA has notified SDs that the Records are not confidential under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given access to such Records without further notice to SDs.

82.     If relevant to the proceeding, the Parties agree that validated sampling or monitoring data generated in accordance with the Work Plan and reviewed and approved by the EPA shall be admissible as evidence, without objection, in any proceeding under this CD.

83.     Notwithstanding any provision of this CD, Plaintiff retain all of its information gathering and inspection authorities and rights, including enforcement actions related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

## XIX.   RETENTION OF RECORDS

84.     Until 10 years after the EPA's Certification of Work Completion under Section 7.4 (Certification of Work Completion) of the RAWP, each SD shall preserve and retain all nonidentical copies of Records (including Records in electronic form) now in its possession **or** control or that come into its possession or control that relate in any manner to its liability under CERCLA with respect to the Site, provided, however, that SDs who are potentially liable as owners or operators of the Site must retain, in addition, all Records that relate to the liability of any other person under CERCLA with respect to the Site. Each SD must also retain, and instruct its contractors and agents to preserve, for the same period of time specified above all nonidentical copies of the last draft or final version of any Records (including Records in electronic form) now in its possession or control or that come into its possession or control that

33

relate in any manner to the performance of the Work, provided, however, that each SD (and its contractors and agents) must retain, in addition, copies of all data generated during the performance of the Work and not contained in the aforementioned Records required to be retained. Each of the above record retention requirements shall apply regardless of any corporate retention policy to the contrary.

85.     At the conclusion of this record retention period, SDs shall notify the United States at least 90 days prior to the destruction of any such Records, and, upon request by the United States and except as provided in ¶ 80 (Privileged and Protected Claims), SDs shall deliver any such Records to the EPA.

86.     Each SD certifies individually that, to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed, or otherwise disposed of any Records (other than identical copies) relating to its potential liability regarding the Site since notification of potential liability by the United States or the State and that it has fully complied with any and all EPA and State requests for information regarding the Site pursuant to Sections 104(e) and 122(e)(3)(B) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e)(3)(B), and Section 3007 of RCRA, 42 U.S.C. § 6927, and state law.

## XX.   NOTICES AND SUBMISSIONS

87.     All approvals, consents, deliverables, modifications, notices, notifications, objections, proposals, reports, and requests specified in this CD must be in writing unless otherwise specified. Whenever, under this CD, notice is required to be given, or a report or other document is required to be sent, by one Party to another, it must be directed to the persons specified below at the addresses specified below. Any Party may change the person and/or address applicable to it by providing notice of such change to all Parties. All notices under this Section are effective upon receipt, unless otherwise specified. Notices required to be sent to the EPA, and not to the United States, should not be sent to the DOJ. Except as otherwise provided, notice to a Party by email (if that option is provided below) or by regular mail in accordance with this Section satisfies any notice requirement of the CD regarding such Party.

**As to the United States:**          EES Case Management Unit
                                      U.S. Department of Justice
                                      Environment and Natural Resources Division
                                      P.O. Box 7611
                                      Washington, D.C. 20044-7611
                                      eescdcopy.enrd@usdoj.gov
                                      Re: DJ # 90-11-3-12205

**As to EPA:**                        Carol Monell, Director
                                      Superfund & Emergency Management Division
                                      U.S. Environmental Protection Agency
                                      Region 4
                                      61 Forsyth Street SW
                                      Atlanta, Georgia 30303
                                      Monell.carol@epa.gov

34

**and:**                              Brad Jackson
                                      EPA Project Coordinator
                                      U.S. Environmental Protection Agency
                                      Region 4
                                      61 Forsyth Street SW
                                      Atlanta, Georgia 30303
                                      Jackson.brad@epa.gov

**As to the Regional Financial**       Paula V. Painter
**Management Officer:**                 Program Analyst
                                       Enforcement Branch
                                       Superfund Emergency Management Division
                                       61 Forsyth Street SW
                                       Atlanta, Georgia 30303
                                       Painter.paula@epa.gov

**At to EPA Cincinnati Finance**       EPA Cincinnati Finance Center
**Center:**                            26 W. Martin Luther King Drive
                                       Cincinnati, Ohio 45268
                                       cinwdacctsreceivable@epa.gov

**As to the State:**                   Sheri Uhlenbruch
                                       Kentucky Department for Environmental Protection
                                       Division of Waste Management
                                       Bldg. 300, 2nd Floor
                                       300 Sower Blvd.
                                       Frankfort, Kentucky 40601
                                       sheri.adkins@ky.gov

**As to SDs:**                         PolyOne Corporation
                                       Ernie Schaub
                                       33587 Walker Road
                                       Avon Lake, Ohio 44012
                                       ernie.schaub@polyone.com
                                       440-930-3611

                                       Westlake Vinyls, Inc.
                                       Kevin P. Sheridan
                                       2468 Industrial Parkway, PO Box 712
                                       Calvert City, KY 42029
                                       ksheridan@westlake.com
                                       270-395-3362

                                       Goodrich Corporation
                                       Bruce Amig
                                       2730 West Tyvola Road
                                       Charlotte, NC 28217

35

Bruce.Amig@UTC.com
704-423-7071

## XXI.   RETENTION OF JURISDICTION

88.     This Court retains jurisdiction over both the subject matter of this CD and SDs for the duration of the performance of the terms and provisions of this CD for the purpose of enabling any of the Parties to apply to the Court at any time for such further order, direction, and relief as may be necessary or appropriate for the construction or modification of this CD, or to effectuate or enforce compliance with its terms, or to resolve disputes in accordance with Section XIII (Dispute Resolution).

## XXII.   APPENDICES

89.     The following appendices are attached to and incorporated into this CD:

"Appendix A" is the ROD.

"Appendix B" is the Work Plan.

"Appendix C" is the description and/or map of the Site.

"Appendix D" is the complete list of SDs.

## XXIII. MODIFICATION

90.     Except as provided in ¶ 13 (Modification of Work Plan or Related Deliverables), material modifications to this CD, including the Work Plan, shall be in writing, signed by the United States and SDs, and shall be effective upon approval by the Court. Except as provided in ¶ 13, non-material modifications to this CD, including the Work Plan, shall be in writing and shall be effective when signed by duly authorized representatives of the United States and SDs. A modification to the Work Plan shall be considered material if it implements a ROD amendment that fundamentally alters the basic features of the selected remedy within the meaning of 40 C.F.R. § 300.435(c)(2)(ii). Before providing its approval to any modification to the Work Plan, the United States will provide the State with a reasonable opportunity to review and comment on the proposed modification.

91.     Nothing in this CD shall be deemed to alter the Court's power to enforce, supervise, or approve modifications to this CD.

## XXIV. LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

92.     This CD shall be lodged with the Court for at least 30 days for public notice and comment in accordance with Section 122(d)(2) of CERCLA, 42 U.S.C. § 9622(d)(2), and 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the

comments regarding the CD disclose facts or considerations that indicate that the CD is inappropriate, improper, or inadequate. SDs consent to the entry of this CD without further notice.

93.      If for any reason the Court should decline to approve this CD in the form presented, this agreement is voidable at the sole discretion of any Party and the terms of the agreement may not be used as evidence in any litigation between the Parties.

## XXV.  SIGNATORIES/SERVICE

94.      Each undersigned representative of a SD to this CD and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice certifies that he or she is fully authorized to enter into the terms and conditions of this CD and to execute and legally bind such Party to this document.

95.      Each SD agrees not to oppose entry of this CD by this Court or to challenge any provision of this CD unless the United States has notified SDs in writing that it no longer supports entry of the CD.

96.      Each SD shall identify, on the attached signature page, the name, address, and telephone number of an agent who is authorized to accept service of process by mail on behalf of that Party with respect to all matters arising under or relating to this CD. SDs agree to accept service in that manner and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court, including, but not limited to, service of a summons. SDs need not file an answer to the complaint in this action unless or until the Court expressly declines to enter this CD.

## XXVI. FINAL JUDGMENT

97.      This CD and its appendices constitute the final, complete, and exclusive agreement and understanding among the Parties regarding the settlement embodied in the CD. The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this CD.

98.      Upon entry of this CD by the Court, this CD shall constitute a final judgment between and among the United States and SDs. The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

SO ORDERED THIS 22 DAY OF Jan , 2020.

2021

_United States District Judge_

Signature Page for CD regarding the B.F. Goodrich Superfund Site

**FOR THE UNITED STATES OF AMERICA:**

SePT. 17, 2020

Dated

JONATHAN D. BRIGHTBILL
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division
Washington, D.C. 20530

ELLEN M. MAHAN
Deputy Chief
Environmental Enforcement Section
U.S. Department of Justice
Environment and Natural Resources Division

KARL FINGERHOOD (PA Bar ID No. 63260)
Senior Counsel
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-7519
Karl.fingerhood@usdoj.gov

_____  4/30/2020

Mary S. Walker
Regional Administrator
U.S. Environmental Protection Agency
Region 4
Atlanta Federal Center
61 Forsyth Street, S.W.
Atlanta, Georgia 30303-8960


_____

Kim A. Jones
Assistant Regional Counsel
U.S. Environmental Protection Agency
Region 4
Atlanta Federal Center
61 Forsyth Street, S.W.
Atlanta, Georgia 30303-8960

Signature Page for CD regarding the B.F. Goodrich Superfund Site

**FOR: POLYONE CORPORATION**

DLK
25 feb 2020

Feb. 25, 2020
_____
Dated

Name: M. John Midea
Title: SVP, Global Operations and Process
Improvement
Address: 33587 Walker Road, Avon Lake, OH 44012

Agent Authorized to Accept Service
on Behalf of Above-signed Party:

| | |
|---|---|
| Name (print): | CT Corporation System |
| Title: | Authorized Agent |
| Company: | CT Corporation System |
| Address: | 306 West Main Street, Suite 512 |
| | Frankfort, KY 40601 |
| Phone: | 866-925-9916 |
| email: | info@ctadvantage.com |

**NOTE: A separate signature page must be signed by each settlor.**

Signature Page for CD regarding the B.F. Goodrich Superfund Site

**FOR** <u>Goodrich Corporation</u>:

[Print name of Settling Defendant]

<u>2/26/20</u>
Dated

Name (print): Kristen W. Sherman
Title: Associate General Counsel
Address: One Hamilton Road, MS 1-1-BC18, Windsor
Locks, CT 06096

Agent Authorized to Accept Service
on Behalf of Above-signed Party:

Name (print): <u>Bruce Amig</u>
Title: <u>Remediation Manager</u>
Company: <u>United Technologies Corporation</u>
Address: <u>2730 West Tyvola Road</u>
<u>Charlotte, NC</u>
Phone: <u>703-423-7071</u>
email: <u>Bruce.Amig@UTC.com</u>

**NOTE: A separate signature page must be signed by each settlor.**

# Signature Page for CD regarding the B.F. Goodrich Superfund Site

## FOR <u>WESTLAKE VINYLS, INC.</u>:

<u>February 26, 2020</u>
Dated

Name (print):  David Huyck
Title: Director-Operations, Region III
Address: 2468 Industrial Parkway Hwy 1523
Calvert City, Kentucky  42029

Agent Authorized to Accept Service
on Behalf of Above-signed Party:

Name (print):     Josh Frank
Title:                  Partner
Company:          Baker Botts
Address:            700 K Street, NW
                          Washington, DC 20001
Phone:              +1.202.639.7748
email:               joshua.frank@bakerbotts.com

**NOTE: A separate signature page must be signed by each settlor.**